UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEAN KURSHAT,

               Plaintiff/Counter-Defendant,         Case No. 04-40281

vs.

                                       HONORABLE PAUL V. GADOLA
                                       HONORABLE STEVEN D. PEPE

GENERAL BEARING CORPORATION,

               Defendant/Counter-Plaintiff.

_____/

## REPORT AND RECOMMENDATION

In Plaintiff's complaint he alleges breach of contract and violation of the Michigan Sales Representatives Commission Act, MCL 600.2961, against his former employer, Defendant General Bearing Corporation. Plaintiff seeks declaratory and monetary relief.

Defendant's Motion For Partial Summary Judgment was referred to the undersigned. For the reasons stated below, IT IS RECOMMENDED that Defendant's Motion for Partial Summary Judgment be GRANTED IN PART with the following result:

(a.)    Defendant be GRANTED summary judgment on Plaintiff's First Amended Complaint;

(b.)    Defendant be GRANTED partial summary judgment on Defendant's Counter-Claim for breach of the Confidentiality Agreement, with the claim regarding Plaintiff's retention of confidential information being GRANTED, but summary judgment with respect to the damages claim for this breach being DENIED and submitted to the trier of fact, and

(c.)    Defendant be DENIED summary judgment on Defendant's Counter-Claim for breach of the Confidentiality Agreement with respect to Plaintiff's use of confidential information and the damages with respect to this claim.

## I.    STANDARD OF REVIEW

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

Rule 56(c) mandates summary judgment against a party who, after adequate time for discovery, fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party has the initial burden of showing "the absence of a genuine issue of material fact." *Id.*, at 323.  Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.*, at 249-50.

Rule 56(e) provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, *by affidavits or as otherwise provided in this rule*, must set forth specific facts showing that there is a genuine issue for trial.  If he does not so respond, summary judgment, *if appropriate*, shall be entered against him."  Fed. R. Civ. P. 56(e) (emphasis supplied).[1]

---

[1]

The Supreme Court has expressly rejected the motion that Rule 56(e) in any way alters the basic standard stated in Rule 56(c) for granting summary judgment.  A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant.  In the language of Rule 56(e), summary judgment is only "appropriate" when the standard outlined in Rule 56(c) is met.

The thrust of Rule 56(e) is that a party may not simply rest on the allegations in his

2

## II.  FACTS

The facts in this matter must be viewed in the light most favorable to the non-moving party. *Blackmore v. Kalamazoo*, 390 F.3d 890, 894-95 (6th Cir.2004).  Therefore, the following facts are taken almost verbatim from Plaintiff's Response.

Defendant, is a manufacturer and supplier of ball bearings and other bearing related products. The relationship between Plaintiff and Defendant dates back to approximately late 1996 or early 1997 when Plaintiff was employed by Ford Motor Company as a buyer in its Visteon division.

In late 1997 Plaintiff began the process of interviewing with a number of automotive-related companies, including General Motors and several of the suppliers he had been in contact with as a buyer for Ford, regarding possible employment.  In this process Plaintiff contacted David Gussack about career opportunities with Defendant.

Defendant extended an offer to hire Plaintiff as the Regional Automotive Sales Manager for its OEM Division.  According to David Gussack, Plaintiff would be responsible for managing Defendant's automotive business and soliciting new accounts (Gussack Dep., p. 17, ¶ 3 [2] – found at Dkt. #31-17, p. 2).

---

pleadings in opposing a motion for summary judgment.  Plaintiffs are not entitled "to get to the jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial . . . ."  Thus in *R. E. Cruise, Inc. v. Bruggeman*, 508 F.2d 415 (6th Cir. 1975) (per curiam), we held that summary judgment was proper where the facts alleged in the complaint were directly contravened in the affidavits supporting the defendants' motion for summary judgment, and where the plaintiff's version of the facts was not presented in any deposition, affidavit, or other document on file, except the pleadings.

*Smith v. Hudson* 600 F.2d 60, 64 -65 (6th Cir. 1979) (citations omitted).

[2] The depositions cited, unless otherwise specified, are those attached as an unenumerated exhibit to Plaintiff's Response).

3

Defendant's offer of employment to Plaintiff was set forth in a letter dated November 13, 1997, which was revised at least three separate times. The first November 13 draft provided for a base salary of $85,000, sales commissions paid pursuant to a schedule to be negotiated later, and three months of severance pay if Plaintiff was terminated after his first six months of employment for reasons other than misconduct (Exhibit A).[3] The second November 13 draft of the offer letter, which Plaintiff does not recall receiving, included the same language concerning salary and commissions, but increased the severance to twelve months of severance pay to be paid in accordance with company guidelines (Exhibit B). The final November 13 revision included the same language concerning salary and commissions, and provided that the severance pay would be paid for twelve months "in the form of continued salary" (Exhibit C). Plaintiff testified about the purpose of the severance pay provision as follows:

> Q. (By Mr. Ludolph) Tell about your discussion with respect to the severance. Was this more than one discussion that you had with Mr. Gussack?
> A. No. This is - - we had basically one discussion that we talked about in the - - for the base salary and then also the severance. And basically I told him that I wanted to ensure that if for some reason I was terminated from the company, other than for just cause, that base salary would be continued for 12 months.

(Kurschat Dep., pp. 30-31 – found at Dkt. # 31-18, p. 1). [4]

---

[3] Exhibit letters refer to Plaintiff's response to the present motion, unless otherwise specified.

[4] The July 29, 1998, letter signed by the General Manger of Defendants OEM Division and "Accepted" by Plaintiff's signing on August 12, 1998, which purports "to consolidate the full details of our offer," does not mention anything about compensation upon termination. Yet, Plaintiff is not disputing that he bargained for a 12 month salary payout upon termination for other than good cause, and apparently received this compensation termination. Thus, because it is not a contested issue of fact, this Report and Recommendation will treat the bargained for "employment agreement" referred to in Plaintiff's First Amended Complaint as including the agreement that if Plaintiff was terminated for other than just cause he would receive this salary for an additional 12 months as severance pay.

4

Plaintiff and Mr. Gussack also had separate conversations concerning the sales commissions that were to be paid to Plaintiff.  At a meeting held at a restaurant in Troy, Michigan, Mr. Gussack presented a proposed commission plan to Plaintiff which was written on small piece of graph paper (Exhibit D).  The proposal indicated that Plaintiff would receive commissions of 2% on the first $2 million of sales per year, 1.5% on the next $2 million of sales per year, and 1% on all sales in excess of $4 million per year (Kurschat Dep., pp. 32-34 – found at Dkt. # 31-18, p. 1).  It was also discussed that the commissions would be paid on any of Defendant's business with Visteon, as well as any other accounts Plaintiff was able to procure for Defendant ( Kurschat Dep., p. 36 – found at Dkt. # 31-18, p. 2).

During the meeting in Troy, Mr. Gussack and Plaintiff also specifically addressed the issue of how sales commissions would be paid.  Plaintiff testified during his deposition that Mr. Gussack agreed that the sales commissions would be paid for as long as the customers continued to pay their invoices:

> A. (By Plaintiff) . . . Lastly I wanted to make sure with him on the length that the commissions would be paid, whether they would be paid – how long.  Is this going to be a one-time deal or whether this is ongoing, and he did tell me that the commissions would be paid as long as the customer pays the invoices.

(Kurschat Dep., p. 35 –  found at Dkt. # 31-18, p. 2).

On June 12, 1998, Plaintiff sent a facsimile to General Bearing which indicated that he was accepting the offer of employment which had previously been outlined in the letter and suggested a starting date of August 17, 1998 (Exhibit E).  Plaintiff's fax also indicated that he was willing to accept the "initial agreed commission", i.e., 2% on sales from $0 to $ 2 million, 1.5% on sales from $2 million to $4 million, and 1% on sales in excess of $4 million.  Plaintiff also indicated that he agreed to a provision which would allow Defendant to phase in the commission payments over a

period of five years, with commissions being paid at 20% of the agreed rate in the first year, 40% of

the agreed rate in the second year, 60% of the agreed rate in the third year, 80% of the agreed rate

in the fourth year, and 100% of the agreed rate thereafter.  When asked during his deposition why he

agreed to the phase-in of his commissions, Plaintiff testified as follows:

> Q. (By Mr. Ludolph) In retrospect, in hindsight, now looking back on it, why would
> you agree to that? Knowing all that you know, why would you agree to it?
> A. Well, David and I had discussed the length of the commission, and he had agreed
> that they would pay these commissions as long as the customers were paying
> invoices.
> Q. And you remember that vividly?
> A. Yes.
> Q. Okay.
> A. In retrospect, I can look back and say if these commissions were going to continue
> basically for the life of the parts, that I could live with a graduated increase - - you
> know, a gradual acceptance of the commissions because there's going to be a long
> history of payment on those commissions and that I would - - I would feel okay that
> that would continue to take place.

(Kurschat Dep., p. 47, ¶ 2 – found at Dkt. # 31-18, p. 3).

On approximately July 29, 1998, Defendant's General Manager – OEM Division, Alistair

Crannis, sent a letter to Plaintiff which purported to "confirm" the terms of the deal (Exhibit F).  The

letter indicated that Plaintiff would be paid an annual salary of $83,000.  With regard to commissions,

the letter set forth the commission schedule that was to be applied according to the agreed-upon

phase-in schedule.  Finally, the letter indicated that Defendant's previous sales representative, Mark

Niehaus, would continue to handle the Visteon account for a period of time, and that Plaintiff would

not begin to receive commissions on the Visteon account until he took over responsibility for the

account.  Plaintiff testified that although this was not originally part of the deal, he agreed to it in

order to avoid any potential conflict with Visteon (Kurschat Dep., pp. 52-53 – found at Dkt. # 31-18,

p. 4).

In August 1998, Plaintiff began his employment with Defendant.  At the time, the only automotive sales for Defendant's OEM Division related to the Visteon business.  During each year of his employment, Plaintiff was successful in dramatically increasing Defendant's automotive sales.

On August 26, 1999, Mr. Crannis sent a letter to Plaintiff indicating that the arrangements to transition Mark Niehaus off the Visteon account had been finalized (Exhibit G).  The letter indicated that the transition would be completed by September 30, 1999, and that Plaintiff's commissions on the Visteon account, and all other accounts, would begin on October 1, 1999.  The letter also included a chart indicating the phase-in of the commission rates over a five year period.  On September 8, 1999, Sean Kurschat signed the letter and returned it to Mr. Crannis.

As time passed, Plaintiff began to realize that Defendant was not honoring the modification.  Although it was agreed when Plaintiff was hired that he would be responsible for all of Defendant's automotive sales (Gussack Dep., p. 17 – found at Dkt. # 31-17, p. 2), a number of problems soon became evident.  Plaintiff learned that some of Defendant's other sales employees had been calling on automotive customers, sometimes even undercutting prices Plaintiff had previously quoted to the same customer.  Quotations which Plaintiff requested for customers were often delayed, and were sometimes incomplete or poorly prepared.  Finally, Plaintiff felt that since he was supposed to be responsible for all of Defendant's automotive sales, he should have a larger role in negotiations with the customers, and more input on all automotive related issues (Kurschat Dep., pp. 81-89 – found at Dkt. # 31-18, pp. 6-8).

In late October and early November 2001, Plaintiff discussed many of these issues with David Gussack.  On November 6, 2001, Plaintiff forwarded a proposal to Mr. Gussack that was intended to address many of the problems (Exhibit H).  Under the proposal, Plaintiff would agree to reduce

7

his sales commissions in exchange for more input and control over the automotive segment of Defendant's business.  Plaintiff was willing to lock his commission rates in at the third step of the phase-in program, i.e., at 60% of their full rate.  In exchange, Defendant would have to change Plaintiff's position from Regional Sales Manager to Director of Automotive.  Consistent with the new position, Defendant would also have to agree to provide Plaintiff more input on quotes, allow Plaintiff to handle all annual negotiations with automotive customers, and allow Plaintiff to provide direct input for all automotive items being handled by other salespeople ( Exhibit H, p. 4).  Plaintiff was supposed to have the responsibilities of a Director of Automotive, and not just an empty title.

Plaintiff testified that David Gussack agreed to and accepted the proposal:

Q. (By Mr. Ludolph) What was Mr. Gussack's response to this proposal? First of all, let's start was it an oral response or was it a written response.
A. It was an oral response.
Q. Okay, what was his oral response to this proposal?
A. He agreed. He agreed that I did do significant things to help the company. He did agree that we should have a review of the quotes before the end all deadline and the time to send to the customer. He did agree that I could handle the annual customer negotiations, and he did agree that I would have direct input for all automotive related items. He agreed and thought it was good proposal.

(Kurschat Dep., p. 89 – Dkt. # 31-18, p. 8).

After Mr. Gussack agreed to the proposal, Defendant continued to pay Plaintiff's sales commissions at the reduced rates set forth in the proposal.  Defendant, Mr. Kurshat alleges, failed to live up to the rest of the bargain.  Plaintiff's testified as follows:

A. . . . [T]here was an agreement to accept lower commissions, and again I already explained this, but I'll reiterate. To accept lower commissions for more control in the automotive sales and more control in the automotive operations, including a title change to director of automotive. And in exchange I agreed to accept lower commission structure for [this] greater increased control in the automotive operations. And General Bearing, while they quickly and readily reduced my commission rate, merely changed the title on my business cards. However, during company-wide communication, introductions at customers and within our open sales force, I was

> introduced as account manager which undermined the effectivity of actually working
> as a director.
>
> Also, in addition to undermining the actual control and direct input to all the
> automotive operations which I was seeking, I didn't have the direct input for quotes
> for other people and giving quotes to other automotive operations. I didn't have direct
> input into hiring as far as hiring people that would have been directly related to the
> automotive operations, and in effect, the agreement was breached because all they did
> was change a simple hollow title but didn't change the actual part of the agreement
> which was to give me more control and direct input. . . .

(Kurschat Dep., pp. 227-228 – found at Dkt. #31-18, pp. 10-11).

In the meantime, Plaintiff continued his efforts to procure automotive business for Defendant,

and the automotive sales continued to grow dramatically.  In 2003, however, Defendant lost two

major automotive programs.  These included the center support bearing business with Dana which

Defendant lost as the result of quality issues, and the loss of the universal joint cup bearing business

with Visteon which Defendant lost when Visteon decided to purchase a different type of product

which Defendant did not offer.  Neither of these losses were related in any way to Plaintiff's

performance.

Nevertheless in late 2003, while Plaintiff was on his honeymoon, he received a memorandum

from Thomas Uhlig, who had been hired as Defendant's Executive Vice President in the fall of 2002,

and who is now Defendant's President.  The memorandum indicated that Mr. Uhlig was unhappy

with the overall automotive sales, and suggested the implementation of a plan that would even further

reduce Plaintiff's commissions.  In a lengthy phone conversation, Plaintiff explained to Uhlig that

although two major programs had been lost for reasons beyond his control, automotive sales for the

company had still increased (Kurschat Dep., pp. 99-101 – found at Dkt. # 31-18, p. 9).  Plaintiff also

told Mr. Uhlig that he was not willing to accept further reductions to his commissions:

> A. I had told Tom that originally when I joined the company, that I had been given
> a commission schedule. It was a commission agreement. I told them that I accepted

9

a schedule to where it took a five-year incorporation period. I told them that if General Bearing wasn't willing to live up to those commissions, that they shouldn't have been made part of our agreement to begin with with David Gussack. I told him at that point in time I was not willing to accept further changes to my commission, to the commission structure. I wasn't willing to do it. That's the way it was. And he continued to really push this issue and push it and push it until it basically was an understanding that we agreed that we - - the only thing we agreed on was that we disagreed, and we left there. And . . . after that I got a fax from the company asking me to sign a letter of confidentiality, and I pretty much saw the writing on the wall . . . .(Kurschat Dep., pp. 103-104 – found at Dkt. # 31-18, p. 10).

In September 2004, Defendant terminated Plaintiff's employment. At that time, Defendant stopped paying sales commissions to Plaintiff. Defendant did, however, continue paying Plaintiff his salary as severance pay in accordance with the original employment agreement.

In the days immediately following his termination, Plaintiff attempted to comply with Defendant's requests for the return of its confidential information. On October 4, 2004, Thomas Uhlig sent a letter to Plaintiff reminding him of his obligation to maintain the confidentiality of certain information, and to return any copies of such information before his last day of employment (Exhibit I). The letter threatened legal action if Plaintiff failed to comply.

On October 5, 2004, Plaintiff sent an e-mail to Defendant's Human Resources Director, Fran Garner, indicating that he had some miscellaneous items he would box up and return (Exhibit J). In this e-mail Plaintiff also confirmed that he had requested and had been granted permission to keep the laptop computer he had been issued by Defendant and asked Ms. Garner to identify anything specific that Defendant wanted him to return. Ms. Garner sent a reply e-mail on the same day, requesting that Plaintiff "pack up any additional records." She also stated that Defendant was "less concerned with the old desk or computer" (*id.*). Nothing in the e-mail or any other communication from Defendant ever instructed Plaintiff to delete the contents of the hard drive on the computer, nor did Defendant ever give him any instructions as to how to deal with the hard drive (Kurschat Dep.,

10

pp. 156-157 – found at Dkt. # 31-18, p. 3).

In the meantime, Plaintiff had begun his search for a new job. He began by looking for employment outside of the bearing industry. He sent out hundreds of resumes and attended numerous interviews, but he was unable to find a new job with comparable pay (Kurschat Dep., p. 152 – found at Dkt. # 31-18, p. 2). With his search for a new job proving difficult, in late October 2004, Plaintiff decided to form a new company with the idea that he might be able to successfully import bearing products from overseas and sell them to customers located in the United States. On October 29, 2004, Plaintiff filed Articles of Organization for his new company, Global Innovative Solutions, L.L.C. (Exhibit K).

On December 3, 2004, Plaintiff received an e-mail from Fran Garner indicating that Defendant was stopping his salary continuation payments based on Defendant's belief that he had violated the terms of his confidentiality agreement (Exhibit L). Plaintiff immediately contacted Ms. Garner and explained his belief that he had turned over everything Defendant had requested (Kurschat Dep., p. 155 – found at Dkt. # 31-18, p. 2). Plaintiff was requested to make a copy of files contained on the hard drive of the computer and forward it to Defendant (Kurschat Dep., p. 156 – found at Dkt. # 31-18, p. 3). Plaintiff promptly complied with this request (*id.*). He also closed down an America On-Line account where much of the confidential information was stored as e-mail (Kurschat Dep., pp. 156-157 – found at Dkt. # 31-18, p. 3-4). Plaintiff was not asked to erase the contents of the hard drive or deliver the computer back to Defendant (Kurschat Dep., pp. 165-166 – found at Dkt. # 31-18, p. 4).

In the months that followed, Plaintiff was able to secure a new job outside of the bearing industry. Because the job did not pay as much as his previous job, however, he decided to also

11

pursue some bearing sales through his new company, Global Innovative Solutions, L.L.C. ("GIS").

GIS  was formed in order to allow Mr. Kurshat to purchase bearing products overseas from low-cost

producers, and sell them to companies located in the United States while maintaining very low

overhead, thus allowing GIS to be a low-cost supplier in the industry (Kurschat Dep., pp. 206-220

– found at Dkt. # 31-18, pp. 5-9).

Plaintiff testified that by doing business in this manner, he could supply bearings at prices

substantially lower than those offered by other top bearing suppliers, including Defendant:

> Q. (By Mr. Ludolph) And you indicated to the purchasing person at Visteon that you could sell it for less than they were paying General Bearing?
> A. I explained to them, and this is not a purchasing person. This is an engineer.
> Q. I'm sorry.
> A. He knew that I used to work as the buyer, so he knew that I had knowledge about the bearings and, you know, general price and cost structures. I did explain to him that I was working as the low cost producer; that my company was organized with low overhead, and that's how I was able to sell at prices lower than anybody else in the industry.
> Q. And specifically you referred to General Bearing; isn't that correct?
> A. I don't recall ever referring to General Bearing directly. But like I said, I can sell lower than General Bearing, I can sell lower than SKF, I can sell lower than NSK, I can sell lower than FAG.
> Q. But in order to do that, you would have to know what they were bidding; isn't that correct?
> A. Not necessarily, no. . . . I don't have to know what they are quoting to bid lower than that. I can bid lower than them any day of the week, seven days of the week. And based on the cost structure of my company, I will quote lower than each and every one of those companies any day of the week, seven days of the week.
> . . .
> A. Again, for me to quote business, it doesn't matter what the price is. I quote business based on my cost structure. . . . I take my cost structure, look at it, put a reasonable markup on it, and I sell bearings at that price. And it's so far below what the other competitors are that I can easily sell lower than - - I think that's how I can say I can sell lower than SKF, I can sell lower than - - I can sell lower than whoever because my overhead cost structure is far, far below what any one of those companies would say, would be able to compete against.

(Kurschat Dep., pp. 217-219 – found at Dkt. # 31-18, p. 8)..

Plaintiff has submitted an affidavit to Defendant which clearly states that Plaintiff never accessed or used Defendant's confidential pricing information for any purposes unrelated to the litigation of this matter (Exhibit M, ¶ 4). Plaintiff also testified that Defendant's pricing information would be of no use to him in his quoting process (Kurschat Dep., pp. 218-221 – found at Dkt. #31-18, pp. 8-9).

Plaintiff erased the files and then destroyed the hard drive of the laptop he had retained after his deposition in which Defendant's counsel asked him why he had not erased the contents of the computer's hard drive (Exhibit M). On August 11, 2005, Defendant's counsel sent a letter to Plaintiff's counsel indicating that the salary continuation payments would once again be suspended due to the fact that it felt Mr. Kurshat had retained confidential information in violation of the Confidentiality Agreement (Dkt. #26-17).

III.   **ANALYSIS**

**A.      Breach of Contract and the Procuring Cause Doctrine**

Plaintiff alleges that the contract between the parties was silent as to what, if any, commissions he would receive upon termination. This silence, Plaintiff argues, necessitates the application of the procuring cause doctrine.[5] Defendant argues that the language of the contract clearly provides that upon termination Plaintiff was to receive severance, in the form of twelve months of base salary, and nothing more.

---

[5] The procuring cause doctrine allows an agent to collect commissions, even after termination of the contract, for sales for which he was the procuring cause or sales to customers whom he procured for the company, *provided* that the contract between the parties was one based upon sales or customer procurement *and* contains no provisions with regard to post-termination commissions. *Roberts Associates, Inc. v. Blazer*, 741 F.Supp. 650 (E.D. Mich. 1990) (sales procurement); *Militzer v. Kal-Die Casting Co*, 41 Mich. App 492 (1972) (expanding doctrine to include customer procurement, but only to the extent there exist reorders for products which were first procured by the plaintiff before the termination date).

13

"The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp,* 445 Mich. 109, 127, n 28; 517 NW2d 19 (1994). In searching for the parties' intent, we first look to the language of the contract. *Sheldon-Seatz, Inc v. Coles,* 319 Mich. 401, 406; 29 NW2d 832 (1947). "Where the language of a contract is clear and unambiguous, the intent of the parties will be ascertained according to its plain sense and meaning." *Haywood v. Fowler,* 190 Mich.App 253, 258; 475 NW2d 458 (1991). "The initial question whether contract language is ambiguous is a question of law." *Port Huron Ed Ass'n v Port Huron Area School Dist,* 452 Mich. 309, 323; 550 NW2d 228 (1996). If the contractual language is either unclear or is reasonably susceptible to different interpretations, then it is considered ambiguous. *Raska v. Farm Bureau Ins Co,* 412 Mich. 355, 362; 314 NW2d 440 (1982). When the language is ambiguous, interpretation of the contract becomes a question for the trier of fact, "and summary disposition is therefore inappropriate." *Meagher v. Wayne State Univ,* 222 Mich.App 700, 722; 565 NW2d 401 (1997).

Plaintiff also argues that the contract was qualified by a statement made by Defendant that commissions would be paid as long as the customer paid its invoices. Yet, generally, "oral evidence of prior or contemporaneous understandings is inadmissible to vary or contradict an unambiguous writing which is intended to memorialize the complete agreement between the parties." *Roberts Associates, Inc v. Blazer Int'l Corp*, 741 F Supp 650, 654 (E.D. Mich. 1990) (citing *NAG Enterprises, Inc v. All State Industries, Inc*, 407 Mich. 407, 409; 285 NW2d 770 (1979)). "Where the language of a contract is clear and unambiguous, the intent of the parties will be ascertained according to its plain sense and meaning." *Haywood v. Fowler*, 190 Mich. App 253, 258; 475 N.W.2d 458 (1991). Moreover, to ascertain such intent, the various parts of a contract should be read together. *See, e.g.,*

14

*First Baptist Church v. Solner*, 341 Mich. 209, 215; 67 N.W.2d 252 (1954), and *JAM Corp v. AARO Disposal, Inc.*, 461 Mich. 161, 170, 600 N.W.2d 617 (1999).

The language in the instant contract providing for post-termination compensation is not ambiguous, "nor is it silent on the subject of post-termination commissions, merely because it fails to also state that post-termination commissions are not owed". *Clark Bros. Sales Co. v. Dana Corp.*, 77 F.Supp.2d 837, 844 (E.D. Mich. 1999). The contract provides that Plaintiff will receive "twelve months severance pay. . . . paid in the form of continued salary" (Exhibit C). "This provision explicitly defines the obligation Defendants owed to Plaintiff upon termination of the Agreement, and limits [its] obligation to payment" of base salary for a period of twelve months. *Id.* "Stated differently, no ambiguity arises from the mere fact that the parties could have phrased their obligations in both positive and negative terms, but elected to state them in only one of these two forms." *Id.* Defendant's express promise to pay Plaintiff's base salary excludes any implied promise to pay any other compensation, such as the post-termination commissions sought by Plaintiff. *See Zynda v. Michigan Aeronautics Comm'n*, 372 Mich. 285, 125 N.W.2d 858, 859 (1964); *Grinnell Bros. v. Brown*, 205 Mich. 134, 171 N.W. 399, 400 (1919) ("The expression of one thing is the exclusion of another, and a thing expressed puts an end to tacit implication.").

The procuring cause doctrine does not require that the parties' express agreement as to post-termination compensation be replaced with a procuring cause analysis. When the parties have expressed the terms of their "fair deal" in an express agreement, there is no basis for a court to

15

impose different or additional terms such as the procuring cause doctrine.[6]  Further, the cases cited by Plaintiff are distinguishable, as they all dealt with fact situations in which the plaintiff's agency agreement, whether oral or written, failed to discuss post-termination compensation.  The undersigned could find no case where the procuring cause doctrine was applied where, as here, the contract specifies what post-termination compensation will be paid.[7]

### B.    Pre-Termination Commissions

In Plaintiff's response to Defendant's motion for summary judgment he argues that his breach of contract claim supports a claim for pre-termination commissions.  Because Defendant did not address this claim in its motion for summary judgment, Plaintiff argues, the claim necessarily survives this motion.

This claim arises, Plaintiff argues, due to Defendant's failure to honor an oral modification of the original contract.  This modification allegedly took place when Defendant accepted Plaintiff's

---

[6] As pointed out in *Clark*, in a series of unpublished decisions, the Sixth Circuit has construed *Reed*'s "procuring cause" doctrine as applicable only where the parties' agreement does not otherwise address post-termination commissions.  *See Sigmann v. Oakley, Inc.*, 1998 WL 199804, at *3, 145 F.3d 1333 (6th Cir. 1998) ("In the absence of an express provision governing [post-termination] commissions, Michigan law applies 'the basic principle of fair dealing.' " (quoting *Reed*)); *Can-Am Engineered Prods., Inc. v. International Tools Ltd.*, 1993 WL 127944, at *4–*5, 993 F.2d 1546 (6th Cir. 1993); *Jack Peddie & Assocs., Inc. v. Whitmor Mfg. Co.*, 1992 WL 355475, at *4–*5, 980 F.2d 729 (6th Cir. 1992) (finding that the procuring cause doctrine applied where "the issue of post-termination commissions was undecided at the time the contract was executed"); *Jack Peddie & Assocs., Inc. v. Advantage Life Prods., Inc.*, 1992 WL 230217, at *2, 976 F.2d 733 (6th Cir. 1992) (holding that the doctrine did not apply where the parties "otherwise agreed" that post-termination commissions would not be paid).

[7] In fact, the only case the undersigned located that even involved a situation where the plaintiff requested post-termination commissions despite receiving a severance package was an unpublished Michigan Appeals case, *Leger v. Image Data Services and Oistad*, 2002 WL 1463555 (Mich. App. 2002).  Yet even *Leger* is distinguishable in that it appears the severance package was not provided for in the parties' express agreement, i.e. there was no post-termination compensation agreement between the parties, as there is in the present case.

November 6, 2001, proposal to lock in his commission at the third-step rate in exchange for a new title, Director of Automotive, and expanded responsibilities, including more input on quotes, all annual negotiations with automotive customers and direct input for all automotive items being handled by others salespeople (Dkt. #31, pp. 11-12). Plaintiff argues that Defendant orally accepted his proposal and reduced his commission, but then changed his position in title only and never allowed him the added responsibilities. Therefore, he argues, he is entitled to the rate of commissions specified in the original agreement.

This theory asserts a breach of an oral modification of the original employment agreement at some point after November 6, 2001, and before Plaintiff's termination entitling him to additional commissions than actually paid for periods prior to his termination.

The First Amended Complaint pleads facts supporting a claim for failure to pay commissions for sales *after* termination where Plaintiff was the procuring cause. Paragraph 8 of Plaintiff's First Amended Complaint refers to an "employment agreement" and note that it does not include any express limitation on sales commissions upon termination. Paragraph 8 of Plaintiff's First Amended Complaint asserts Defendant "breached the employment agreement . . . by failing to pay sales commissions pursuant to the agreement." Paragraph 10 asserts a breach of the employment contract.[8] A plain reading of paragraph 10 in light of paragraph 8's assertion that the employment

---

[8]     Under Count I - Breach of Contract the First Amended Complaint indicates that
7. The employment agreement between Plaintiff and Defendant provided for the payment of sales commissions to Plaintiff.
8. The employment agreement did not include any express limitation on the sales commissions that would be paid to Plaintiff in the event of termination.
9. The employment relationship between Plaintiff and Defendant was terminated in September 2004.
10. Defendant has breached the employment agreement between the parties by failing to pay sales commissions pursuant to the agreement.

agreement has no limitation of sales commission upon termination is that the breach alleged involved payment of sales commissions after termination of the employment relation.  There are no specific facts alleged in Count I or elsewhere in the First Amended Complaint that would suggest Plaintiff was complaining about sales commissions he received prior to his termination.  Accordingly, there no facts asserted in the Plaintiff's First Amended Complaint that support the new claim made in Plaintiff's response brief to Defendant's motion that in addition to a post-termination breach of contract, there was also a separate pre-termination breach of contract. [9]  This is not to say Plaintiff could not have alleged two separate breaches of his employment agreement by Defendant, but merely that he has not pled such facts.

The Federal Rules of Civil Procedure provide that a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). While this pleading standard is quite liberal, a plaintiff must " 'allege a factual predicate concrete enough to warrant further proceedings.' " *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 530 (6th Cir. 2001) (citation omitted).  In other words, the "complaint . . . must contain either direct or inferential allegations respecting all the material elements to sustain

---

[9] Under Count II - Declaratory Judgment of the First Amended Complaint Plaintiff alleges:

> 13. During the term of the relationship between the parties, Plaintiff was responsible for procuring programs and orders for the sale of Defendant's products that have and will continue to result in sales for Defendant after Plaintiff's termination.
> 14. Pursuant to Michigan's Procuring Cause Doctrine, Plaintiff is entitled to receive sales commissions on all sales for which Plaintiff was the procuring cause, notwithstanding the termination of the relationship between the parties.
> 15. Defendant has indicated that it does not intend to pay Plaintiff all of the commissions earned by Plaintiff on the business Plaintiff procured prior to his termination.

a recovery under some viable legal theory." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir.1998) (internal quotation marks and citation omitted).

As the First Circuit stated,

[w]e are not holding the pleader to an impossibly high standard; we recognize the policies behind rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

*O'Brien v. DiGrazia*, 544 F.2d 543, 546 n. 3 (1st Cir. 1976).[10]

Plaintiff failed to include in his complaint the facts or allegations concerning his claim to pre-termination commissions. Therefore, this claim is not before the court.[11]

### C.    Violation of the Sales Commission Representatives Act

On the facts Plaintiff has pled in his current complaint and attempted to support regarding post-termination commissions, he has failed to plead and demonstrate facts sufficient to support his claim that Defendant failed to pay commissions owed under the parties' agreement. Accordingly,

---

[10] *Compare Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974 (2d Cir. 1945), where Chief Judge Charles Clark, joined by Judges Learned and Augustus Hand, held that with adequate notice to the defendant, a federal court can grant relief on the facts stated in the complaint based on a legal theory different from the one pled by the plaintiff. Yet, *Gins* held that at a minimum the Complaint must contain

A simple statement in sequence of the events which have transpired, coupled with a direct claim by way of demand for judgment of what the plaintiff expects and hopes to recover . . . .

148 F.2d at 976. In the absence of a "simple statement in sequence of the events which have transpired" federal courts are not at liberty to reach out and add factual premises to a complaint in order to create a new cause of action. That is a party's obligation under Fed. R. Civ. P. 15(a).

[11] Plaintiff argues that it was made clear during his deposition that he also was asserting a claim for pre-termination commissions (Dkt. # 31, p. 20). Yet Plaintiff does not point to and the undersigned could find, no law which allows a plaintiff to implicitly amend their pleading by informing the defendant that they wish to pursue causes of action not pled.

he cannot proceed on a claim under Michigan's Sales Commission Representatives Act ("SCRA").

 In *Flynn v. Flint Coatings, Inc.,* 230 Mich. App. 633, 584 N.W.2d 627, 629 (1998), the Michigan

Court of Appeals held that the SRCA does not "create a new obligation or impose a new duty" to pay

sales commissions, and that a principal "who was not liable under the common law is not liable under

the SRCA."  Rather, this statute merely "changes the remedy for failure to pay sales commissions."

 Thus, because the parties' agreement under the facts pled does not entitle Plaintiff to any post-

termination commissions, he cannot state a viable claim under the SRCA.  *Clark Bros. Sales Co.*, 77

F.Supp.2d at 852; *Patterson v. Citation Corp.*, 2000 WL 658715, *4 (6th Cir. 2000).

**D.      Defendant's Claim for Breach of Confidentiality Agreement**

The parties executed two "Employee Confidentiality Agreement" forms on August 12, 1998,

and January 21, 2004 (Defendant's Motion, Exhs. 9 and 10).[12]  The Confidentiality Agreement

required Plaintiff to refrain from disclosing any confidential information or using any confidential

information (a.) for his benefit or the benefit of another and (b.) in any way adverse to Defendant.

The Agreement also required Plaintiff to "promptly deliver" to Defendant all confidential information

in his possession at the time of termination (*id.*).

Confidential information is defined in the Confidentiality Agreement as any "proprietary

information or materials, including but not limited to records, files, memoranda, notes, reports, price

lists, customer lists, . . . , data, computer software" which he obtained or learned about during his

employment (*id.*).  The crux of Defendant's argument regarding Plaintiff's alleged breach of this

agreement is his post-termination retention of a company laptop that contained confidential

_____

[12] The agreements appear to be identical, but where the undersigned refers to the "Confidentiality Agreement" it is the January 21, 2004, Confidentiality Agreement that is being referenced.

information.  Though Defendant apparently does not dispute the fact that Plaintiff was given permission to retain the laptop, it argues that the confidential information contained therein should have been returned but was instead retained and used by Plaintiff to solicit Defendant's customers.

The only evidence Defendant provides to support the contention that Plaintiff used confidential information to solicit its customers is Plaintiff's testimony that in the course of his current business he will "tell all my customers I can sell at a lower price" and "I have told customers I can sell at a lower price than [Defendant] General Bearing" (Kurshat Dep., p. 137 – found at Dkt. # 26-2, p. 31).

Yet the deposition testimony also includes Plaintiff's statement that he does not need to know Defendant's price because he can always undersell anyone due to the fact that he has no "limiting factor" (*Id.* at p. 138 – found at Dkt. # 26-2, p. 32).  Therefore, there is a genuine issue of material fact regarding Defendant's claim that Plaintiff used the confidential information he retained.

There remains no genuine of material fact regarding Plaintiff's post-termination retention of confidential information.  Plaintiff testified that at his June 10, 2005, deposition – almost a year after his September 2004 termination – that he retained a copy of Defendant's pricing structure on the laptop at issue (*Id.* at p. 221 – found at Dkt. # 26-2, p. 33).  Plaintiff argues that Defendant did not specifically direct him to remove confidential information from the laptop.  Yet this argument is without merit, as the Confidentiality Agreement did specifically define confidential information and direct him to return it upon termination – no further instruction was required.  The exchange over Plaintiff keeping his computer is not sufficient to allow a finding that Defendant waived the Confidentiality Agreement, nor has Plaintiff raised this argument.

With regard to damages for this breach, the Confidentiality Agreement does not contain a

liquidated damages provision, but Defendant argues that it is entitled to a return of the severance payments made to Plaintiff, apparently in light of the fact that the Confidentiality Agreement was made "in consideration of employment" (Dkt. #26, Exh. 10). Plaintiff does not specifically provide a counter legal argument for this calculation of damages, but maintains that Defendant cannot demonstrate that it has lost any business or has been damaged in any way. Plaintiff also alleges that he was under the mistaken impression that he had fulfilled his obligation under the Confidentiality Agreement.

Moreover, contract damages are generally limited to "an award of money damages in an amount reasonably calculated to make [the damaged party] whole" and "this compensation principle generally measures the damages according to the pecuniary loss suffered by the promisee, [] rather than according to the benefits gained by the promisor as a result of the breach.[]" WILLISTON ON CONTRACTS §64:1.

> This goal of compensating the promisee following a breach of contract by the promisor is, to the extent possible through an award of money damages, to place the plaintiff—promisee in as good a position as he or she would have occupied had the defendant-promisor not breached the contract.[] In other words, the plaintiff—promisee is entitled to the benefit of his or her bargain and should be placed, as nearly as is possible through an award of money damages, in the position he or she would have been in had the defendant-promisor fully performed the contract.[]
>
>      * * * *
>
> In some cases, such as an action based on a negotiable instrument where the defendant breaches an undisputed, unilateral obligation to pay a liquidated sum of money, it will be a simple matter for the court to apply this damage formula and to fix with mathematical precision the exact amount due the plaintiff as a result of the defendant's breach. Frequently, however, disputed facts or problems of proof or both make the exact measurement of damages more difficult, and in these cases, a jury or other trier of fact must estimate, under proper instructions from the court, the amount of damages that the plaintiff should receive.[]

*Id.*

Due to the fact that there remains a genuine issue of material fact regarding Plaintiff's use of the confidential information he retained, arguably his "mistake" of fact regarding his compliance with the Confidentiality Agreement (which could effect damages but not the claim for breach) and the extent to which Defendant was damaged due to Plaintiff's retention and possible use of the confidential information, it is recommended that summary judgment be granted only in part with respect to part of Defendant's counter-claim.

In sum, there being no genuine issue of material fact regarding Plaintiff's retention of confidential information, Defendant is entitled to summary judgment on this issue. The matter of calculation of damages for this breach, whether Plaintiff also breached the Confidentiality Agreement by using the confidential information and the resulting damages for that breach remain to be determined by the trier of fact.[13]

## IV.    RECOMMENDATION

For the reasons stated above, it is Recommended that Defendant's Motion for Partial Summary Judgment be GRANTED IN PART with the following result:

(a.)    Defendant be GRANTED summary judgment on Plaintiff's First Amended Complaint;

(b.)    Defendant be GRANTED partial summary judgment on Defendant's Counter-Claim for breach of the Confidentiality Agreement, with the claim regarding Plaintiff's retention of confidential information being GRANTED, but summary judgment with respect to the damages claim for this breach being DENIED and submitted to the trier of fact, and

---

[13] The undersigned is aware that the issue of Plaintiff's post-deposition destruction of the materials on the hard-drive of the laptop could be construed as spoliation. Yet, while Defendant discussed the facts surrounding Plaintiff's treatment of the information on the hard-drive, a spoliation claim was not specifically asserted by Defendant and could, therefore, not be considered in the context of this motion.

(c.)     Defendant be DENIED summary judgment on Defendant's Counter-Claim for breach of the Confidentiality Agreement with respect to Plaintiff's use of confidential information and the damages with respect to this claim.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days of service, as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections, which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: January 9, 2007                                        s/Steven D. Pepe
Ann Arbor, Michigan                                          United States Magistrate Judge



Certificate of Service

24

I hereby certify that on January 9, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Kevin P. Albus, Randall J. Gillary, Robert C. Ludolph, James D. VandeWyngearde, and I herby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: not applicable

s/ James P. Peltier
Courtroom Deputy Clerk
U.S. District Court
600 Church St.
Flint, MI 48502
810-341-7850
pete_peltier@mied.uscourts.gov

25